IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 23, 2024 Session

## KENNETH BARNETT v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
No. 122155   Steven W. Sword, Judge

_____

## No. E2022-01729-CCA-R3-PC
_____

Petitioner, Kenneth Barnett, appeals from the Knox County Criminal Court's denial of his petition for post-conviction relief related to his convictions for six counts of aggravated burglary, six counts of theft, and two counts of unlawful possession of a weapon by a convicted felon.  Petitioner argues that the post-conviction court erred in denying relief based upon his claims that he received ineffective assistance of counsel because trial counsel failed to (1) investigate or seek testing of Petitioner's blood, urine, and cigarettes; (2) file a motion to suppress Petitioner's confession; and (3) adequately cross-examine law enforcement witnesses regarding the credibility of the confession and chain of custody issues with a gun magazine.  After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Autumn M. Bowling (on appeal and at oral argument) and Brian D. Sableman (at hearing), Knoxville, Tennessee, for the appellant, Kenneth Barnett.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Procedural history*

The Knox County Grand Jury issued a thirty-two-count indictment related to Petitioner's involvement in a series of burglaries and thefts committed between October

24, 2017, and December 11, 2017. Before trial, the State dismissed ten counts of the indictment. After a jury trial, Petitioner was convicted of six counts of aggravated burglary (Counts 1, 3, 5, 7, 17, and 20); six counts of theft (Counts 23, 24, 25, 26, 31, and 32); and two counts of unlawful possession of a weapon by a convicted felon (Counts 19 and 22). *State v. Barnett*, No. E2020-01542-CCA-R3-CD, 2021 WL 4775628, at *1 (Tenn. Crim. App. Oct. 13, 2021), *no perm. app. filed.* This court summarized the evidence at trial as follows:[1]

Robert Knight testified that his wife alerted him to an apparent burglary at their residence on Bellevue Street in the Whittle Springs area on November 30, 2017, when she returned home for lunch. His wife found the bedroom window open and her nightstand moved, which led her to call 9-1-1 and Mr. Knight. Mr. Knight stated that he had an alarm system, and while the system was not armed at the time, he was able to later find the times the windows were opened based on the security app on his phone. When the police and Mr. Knight arrived at the home, Mr. Knight found two of his firearms and holsters were missing from the residence, along with jewelry and change. Mr. Knight described one of the firearms as a "Glock 19 Gen 4" enclosed in a "generic Safariland nylon holster." Mr. Knight described the second gun as a "Springfield XD-S three, a nine-millimeter with a spare magazine" that he kept "in a custom leather Savoy holster[,]" which had an inscription of a Bible verse. He stated that the holster had a value of $125. The value of the property stolen from Mr. Knight's home totaled approximately $3,000. The Glock was ultimately recovered in Georgia during a routine traffic stop, and the stolen jewelry was recovered from a pawn shop. The Springfield pistol was never recovered. Mr. Knight testified that he had never met [Petitioner] and that he had not given him permission to remove property, including the firearms, from his home.

Jeremy McCord testified that he had worked for the Knox County Sheriff's Office since September of 2007. Mr. McCord's aunt, Deloris Miller, had a residence on Gaston Avenue in 2017. Mr. McCord stated that he was familiar with his aunt's residence and frequented it his entire life. He testified that Ms. Miller owned a firearm and that she routinely stored it in the back bedroom in either the top drawer of her dresser or the upper part of her closet, along with the firearm's magazine. He stated that he had seen the firearm in the location where it was normally stored many times.

---

[1] On direct appeal, Petitioner claimed only that the evidence was insufficient to support his convictions for two counts of unlawful possession of a weapon by a convicted felon. As such, this court limited its summary of the proof presented at trial to the two counts of aggravated burglary and two counts of theft that involved a weapon.

- 2 -

On December 11, 2017, Ms. Miller was on life support in Chattanooga, and Jay Halliburton, who also resided at the home, was out of town. Mr. McCord received a phone call from an alarm company reporting a motion alarm at Ms. Miller's residence. Mr. McCord verified that Mr. Halliburton was not on the premises at the time of the alarm, and Mr. McCord proceeded to the house himself. When he arrived at the home, Knoxville Police Department ("KPD") officers were talking to [Petitioner], who was inside the residence. Mr. McCord stated that [Petitioner] was taken into custody on the back porch.

Mr. McCord worked with the officers to verify that the residence belonged to his aunt and that he did not know [Petitioner]. He also pointed out several items from the residence on [Petitioner]'s person. He had not previously seen or met [Petitioner], and he did not know of any reason why [Petitioner] would be in Ms. Miller's house on the day of the incident. Further, Mr. McCord found that the firearm kept in the house had been moved from its ordinary location to a different location in the house.

On cross-examination, Mr. McCord stated that the firearm's magazine was found on [Petitioner]'s person when [Petitioner] was arrested. On redirect examination, Mr. McCord identified [Petitioner] as the individual he saw come out of Ms. Miller's house.

KPD Officer John Pickens testified that he responded to a call from a burglar alarm at a house on Gaston Avenue on December 11, 2017, at about 10:40 a.m. He contacted his partner, Officer Jeff Damewood, and they responded to the call. When they arrived on the scene, they found a backpack sitting on the back porch of the house. It was not clear to the officers whether an individual was inside the house. However, Officer Pickens stated that [Petitioner] came out after a "very short period of time" and surrendered. Officer Pickens searched [Petitioner] and found a firearm magazine and other property taken from the residence in his pockets. [Petitioner] was arrested and transported to KPD.

KPD Investigator Brian Leatherwood, who worked in the property crimes unit, questioned [Petitioner] about other burglaries to which he had been linked, primarily through pawn shop transactions. [Petitioner] admitted that he took two guns from a house in the Whittle Springs area and sold them on the street. When asked for specifics, [Petitioner] explained that he stole a Springfield firearm with a nice leather holster that was inscribed with a Bible verse, as well as a spare magazine. [Petitioner] also mentioned a Glock in a

standard holster. Investigator Leatherwood stated that [Petitioner]'s answers matched the descriptions of Mr. Knight's stolen firearms.

During trial, the State offered into evidence certified judgments of prior convictions for burglary in July 2007, as well as aggravated burglary and facilitation of aggravated burglary in September 2012. The trial judge allowed the admission of this evidence but cautioned the jury that they could not consider the prior convictions for anything other than the purpose of determining whether [Petitioner] had a prior disqualifying felony conviction that would prohibit him from possessing a gun.

Following deliberations, the jury convicted [Petitioner] of two counts of unlawful possession of a weapon by a convicted felon, six counts of aggravated burglary, and six counts of theft of property. The jury acquitted [Petitioner] of the remaining aggravated burglary and theft counts [in Counts 9, 11, 13, 15, 27, 28, 29, and 30]. The trial court imposed an effective thirty-five-year sentence.

*Id.* at *1-2. This court affirmed Petitioner's convictions, and Petitioner did not seek further review. *Id.*

Petitioner then filed a timely pro se petition for post-conviction relief. Post-conviction counsel was appointed and filed an amended petition, arguing that Petitioner received ineffective assistance of counsel because trial counsel failed to (1) investigate the circumstances of Petitioner's confession, including adequately interviewing Petitioner, requesting a copy of Petitioner's mental health examination at the jail, and requesting funds to obtain a toxicology report using Petitioner's blood sample; (2) file a motion to suppress the confession as unknowing and involuntary; and (3) cross-examine the State's witnesses about the credibility of Petitioner's confession and the chain of custody of the "gun clip."[2] Post-conviction counsel specified that Petitioner was only seeking relief from his convictions in Count 19, possession of a firearm by a convicted felon on November 30, 2017, related to Mr. Knight's guns, and Count 22, possession of a firearm by a convicted felon on December 11, 2017, related to Ms. Miller's gun.

At the post-conviction hearing, trial counsel testified that he was appointed to Petitioner's case a couple months before trial. He visited Petitioner in jail at least two or three times. Trial counsel noted that he and Petitioner discussed the case during jail visits

---

[2] Throughout the post-conviction proceedings, post-conviction counsel and trial counsel used "gun clip" interchangeably with the term "magazine"; it is apparent from the photographic exhibits that only a gun magazine was involved in this case.

- 4 -

and throughout the trial. Trial counsel did not think he and Petitioner watched Petitioner's video-recorded confession or listened to the recording of the preliminary hearings together.[3] Trial counsel noted that the preliminary hearing in this case was not transcribed, and he did not recall whether he obtained recordings of preliminary hearings from "both sets of charges." He stated, though, that he listened to the recorded hearings in their entirety.

Trial counsel did not remember if Investigator Leatherwood[4] testified at both preliminary hearings. When asked whether Investigator Leatherwood testified about Petitioner's "competency and coherence during the interrogation," trial counsel responded, "I don't remember what he testified to specifically. I know that there was testimony introduced regarding drug use and hunger."

Trial counsel testified that he received and watched police dashboard camera recordings from the arrest. He recalled Petitioner's being allowed to smoke a cigarette before entering the police cruiser. Trial counsel said that he "definitely" remembered Petitioner's telling him that "there was crack involved" with the cigarette. He stated that it sounded "vaguely familiar" that Petitioner had been allowed to smoke a cigarette containing crack cocaine during his arrest. However, trial counsel also said that he did not "specifically" remember Petitioner's saying that the cigarette contained crack cocaine and later stated, "I just remember him saying that he had done crack . . . pretty recently before he was arrested. That's . . . what I recall, . . . was him telling me that he was high." Trial counsel added that Petitioner reported smoking crack cocaine "that day, or fairly recently" and not having eaten in days. Trial counsel "kind of" remembered a conversation in which Petitioner referred to the cigarette as "loaded"; counsel stated that he "would assume" the cigarette to which Petitioner referred was the same one Petitioner smoked during his arrest.

Officer Damewood's December 11, 2017 police cruiser recording was received as an exhibit and reflected officers' escorting Petitioner to the front of the police cruiser in handcuffs. One officer removed items from Petitioner's pockets, and Petitioner stood and conversed with him, although no audio was captured. A second officer stood nearby, and

---

[3] Although trial counsel initially referred to the "preliminary hearing audio" in the singular, post-conviction counsel and trial counsel both later referred to more than one preliminary hearing stemming from two "sets of charges."

[4] Post-conviction counsel noted at the beginning of the post-conviction hearing that he had subpoenaed Investigator Leatherwood and "Officer Janish" to testify; however, Investigator Leatherwood was out of town, and the prosecutor did not know if Officer Janish still worked for the KPD. When asked by the post-conviction court whether Petitioner wished to continue the hearing until Investigator Leatherwood was available to testify, post-conviction counsel stated that he could "do it piecemeal." However, the record does not reflect that a later post-conviction hearing occurred or that Investigator Leatherwood ever testified.

a third officer later approached and spoke briefly with Petitioner. Petitioner was steady on his feet, and he appeared to respond verbally to the officer searching him and tracked the officer visually as the officer searched both sides of his jacket. Before the officer reached into Petitioner's backpack, the officer pointed into it, and Petitioner shook his head as though responding negatively to a question. The officer removed an article of clothing from the backpack, and Petitioner leaned forward as the officer used the clothing to wipe Petitioner's face. After a few moments, the officer placed a cigarette in Petitioner's mouth and lit it; the origin of the cigarette was not evident. Petitioner continued speaking to the officers as he smoked. The recording began to include audio when Petitioner was placed in the backseat of the police cruiser; an officer remarked that Petitioner could finish his cigarette inside the car. Petitioner made several statements quietly to himself, including, "Well, it's over"; "Should have f--king kept going when I was going"; "Man, why didn't I keep going?"; "I'm sweating"; and several expletives. At one point, Petitioner asked Officer Pickens to remove Petitioner's hat and wipe his face with it because he was too warm. As Officer Damewood drove to the police department, he asked Petitioner if he had been sleeping outside, and Petitioner responded affirmatively, stating that he slept in the woods, under bridges, and in alleyways. Petitioner also discussed at some length the negative effects of cocaine addiction on his life; he noted that he had tried methamphetamine once but did not like it. Our review of the recording reflects that Petitioner was polite, responsive to questions, and spoke clearly.

Officer Pickens' police cruiser recording was also received as an exhibit and showed Officer Damewood's car at a distance down the street with Petitioner and several officers standing in front of it. Audio included Petitioner's being advised of his *Miranda* rights, answering the officers' questions about the items in his pockets, discussing his drug use, and stating that a gun was inside the house, although he denied having touched it. Petitioner asked if he could smoke a cigarette and told the officers in which pocket of his backpack to find one. He also asked the officers to wipe his face and denied that his backpack contained any needles. At one point, an officer asked Petitioner if he smoked marijuana and commented, "There's a little weed residue in there."

Although Petitioner's police interview was not explicitly[5] exhibited to the post-conviction hearing, Petitioner filed, and this court granted, a motion to take judicial notice of the record in Petitioner's direct appeal in order to aid our review. The portion of the interview in the trial record reflected that Petitioner sat alone in the interview room for about eight and a half minutes, during which time he looked around, wiped his face with his hands, and yawned; he did not fidget excessively. Petitioner wore a light-colored short-

---

[5] At the post-conviction hearing, the prosecutor remarked that she assumed the trial transcript would be part of the "technical record." The post-conviction court responded that it was going to "accept the entire technical record, which will include the transcript."

sleeved t-shirt that did not reflect any sweat marks. An officer brought Petitioner a pack of peanut butter crackers, a bag of corn chips, and a canned drink. When Investigator Leatherwood entered the room, Petitioner asked if he could keep eating because he had not eaten in days. Our review of the recording reflects that, although Petitioner sometimes spoke at a low volume, his speech was audible and clear throughout the recording. He was polite and expressed his desire to be helpful. Petitioner answered questions responsively and gave narrative accounts of events when appropriate.

In the recording, Petitioner confirmed his personal information and stated that he obtained a GED in prison. When asked if he used illegal drugs, Petitioner stated that he smoked crack cocaine "every chance that [he could] get"; he later added that he sometimes smoked marijuana to "come down" from cocaine. Petitioner stated that he had last used cocaine around 6:00 or 7:00 a.m. that morning. Investigator Leatherwood noted that it was about 11:45 a.m. and that Petitioner looked "pretty straight."

In the recording, Investigator Leatherwood stated that he was investigating house break-ins and that Petitioner had sold some property from the break-ins at pawn shops. Petitioner stated that he "probably" broke into the houses and would help Investigator Leatherwood any way he needed. Petitioner noted that his addiction had "taken [him] over" and that he only thought about how to obtain cocaine. Petitioner described how he began using cocaine and its effect on his life. Petitioner paid attention as Investigator Leatherwood read him an advice of rights and waiver form, and Petitioner signed it in two places. When Investigator Leatherwood described a burglary in which the perpetrator had used a Sawzall to enter a house, Petitioner stated that he used an ax to create a hole in the house's siding because the only entryway was the front door; he listed specific items he took from the house. Petitioner described additional burglaries, including descriptions of where the houses were located and what he took. Petitioner also examined photographs Investigator Leatherwood showed him of items that had been reported missing. Petitioner identified several items that he did not recall stealing, although he noted that he sometimes discarded items he did not think were valuable enough to sell. He said that he remembered the items he pawned or sold because he searched for their value on Google. Petitioner stated that he had stolen three guns, two of which came from the same house and were in leather holsters. He agreed with Investigator Leatherwood that one holster was inscribed with a Bible verse. Petitioner stated that one of the guns was a Glock.

In the recording, Petitioner explained that he would pawn or sell jewelry wherever he could find an establishment that would accept them, and he described the location of several shops; he noted that people on the street would not buy or trade drugs for jewelry but that he had traded guns and marijuana he obtained during burglaries for cocaine. Petitioner stated that, when a pawn shop declined to do further business with him, he was undeterred because he could easily find another pawn shop.

Trial counsel testified that he did not do anything to obtain a toxicology report from the day of Petitioner's arrest, explaining, "If it were . . . relevant to the case, it would have been . . . provided in discovery. On the defense side, . . . I'm not aware of any caselaw that says voluntary intoxication mitigates anything with regard to confessions. So . . . . I can't give you a reason why, just I'm not sure why I would." Trial counsel did not recall whether Petitioner told him that he had blood taken on the day of his arrest or that a mental health evaluation was performed at the jail.

When asked if a defendant's intoxication had any bearing on whether a confession was knowing and voluntary, trial counsel replied, "No. My opinion is it has bearing as a jury question. I don't think it has bearing as a legal question."

Trial counsel testified that the "big point" he argued to the jury at trial was that Petitioner was "confessing to anything and everything [the interrogators] threw at him because they were feeding him and he was high." Trial counsel explained that he did not "try to contradict" Investigator Leatherwood's testimony that Petitioner's last drug use was six hours before the confession because the only way to do so was for Petitioner to testify, "and that wasn't really an option." Trial counsel acknowledged, though, that he could have cross-examined the patrol officers who were on scene about the cigarette and "suggested" that another substance was in it. He did not recall an officer's remarking in the dashboard camera recording that marijuana residue was in Petitioner's cigarette pack.

When asked if Petitioner exhibited physical signs of intoxication in the police recordings, trial counsel responded,

> I mean, we definitely argued that . . . . But he seemed hungry, for sure. And it would have been consistent with being high or nervous. Like, I don't . . . know that anything necessarily stood out as[,] that guy's loaded. I don't remember that being necessarily true.

Trial counsel stated that Petitioner was not visibly sweating in the police cruiser recordings; he did not recall whether Officer Damewood commented on Petitioner's sweating in the recording. Trial counsel agreed that sweating could be a physical sign of "being impaired." He agreed that Petitioner asked the officer to remove his hat because he was sweating.

When asked whether he could have cross-examined the officers about the sweating to "support the assertion that [Petitioner] had smoked a loaded cigarette," trial counsel stated that doing so would have involved informing a police officer that he had allowed Petitioner to smoke crack cocaine or marijuana. Trial counsel did not know how he would have presented the question when "it's not in evidence anywhere," and he noted that

- 8 -

officers "testify all the time about smelling drugs and stuff like that, so it would be a real odd question . . . when you're just trying to get them to agree with you, which is usually what I try to do with detectives." Trial counsel opined that "it didn't seem like a good way to go in front of a jury." When asked whether he could have asked officers if Petitioner's sweating was consistent with recent drug use and intoxication, trial counsel responded, "I could have. And I think I probably did, actually, during the trial. I'm not sure. But at some point during that trial, I'm pretty sure I asked that officer if he thought [Petitioner] was high." Trial counsel admitted that he offered no extrinsic evidence to support the defense's position that Petitioner was high during his interview.

Trial counsel testified that Officer Pickens' dashboard camera recording reflected an officer's stating that "there's weed in the bottom of it[.]" Trial counsel stated that he assumed the officer was talking about Petitioner's pack of cigarettes, although counsel did not know if that pack was the source of the cigarette Petitioner smoked. Trial counsel noted that the officer had also discussed "a glass pipe or something." Trial counsel "guess[ed]" that the residue could have supported an argument that Petitioner's cigarette contained illegal drugs; he noted, however, that he "still [didn't] understand why" he would have asked the question because "[t]here was no question that [Petitioner] was high and hungry." Trial counsel did not recall if Investigator Leatherwood's statement that Petitioner's last drug use was six hours before the interview was used to support an assertion that Petitioner was "coherent."

A transcript of Investigator Leatherwood's trial testimony was received as an exhibit and reflected that, when describing his initial interview with Petitioner, he stated that he asked Petitioner if he was taking any prescription or street drugs. According to Investigator Leatherwood, Petitioner said that he had used crack cocaine about six hours prior to the interview. When asked if Petitioner appeared to be under the influence of drugs, Investigator Leatherwood stated that he did not have difficulty understanding Petitioner, that Petitioner was "coherent," and that Petitioner's speech "appeared to be normal." Trial counsel agreed that Petitioner was coherent in the recording.

When asked if it would have benefitted Petitioner to elicit from Investigator Leatherwood on cross-examination that Petitioner had consumed crack cocaine less than one hour before the interview, trial counsel responded,

> I don't know how it would have been. But . . . I'm also not sure how I could have presented evidence that there was crack in that cigarette . . . . I just don't understand how I present that evidence. I can ask . . . the officer that, did you know there was crack in that cigarette and he's going to say no. And then that's the end of that.

Trial counsel agreed that a toxicology report could have proven that Petitioner had recently smoked crack cocaine. He disagreed that such a report would have benefitted Petitioner because "the Judge is not going to keep his confession out because he's high. There's no legal basis for that, so it's coming in. So they're going to see the confession. They agree that he was high and hungry." Trial counsel continued, "[I]t would have been a lot of questioning about a cigarette that I don't have any proof had any crack in it, which would have been a complete distraction to the jury."

Trial counsel recalled Mr. McCord's trial testimony that Ms. Miller's gun was normally kept in a side table drawer, but that the gun had been found on a bookshelf. Trial counsel noted that Petitioner had ammunition on his person when he was arrested but not the gun. Trial counsel agreed that he did not object to the prosecutor's asking Mr. McCord, "And if [the gun] were located in some other place within the house, would you know whether or not it had been moved from that location?" Trial counsel disagreed that the question was "ambiguous and possibly suggestive that [Petitioner] is the one who moved the gun[.]" Trial counsel stated, though, "I mean, that's what he's saying, yeah. It doesn't make it objectionable." Trial counsel noted that Mr. McCord also testified that he visited Ms. Miller's house "all the time" and that nobody else had been in the house before Petitioner's arrest. Trial counsel identified photographs from the house, which showed a gun magazine on a table and a handgun on a bookshelf.

Trial counsel acknowledged that, on cross-examination, he asked Mr. McCord if the gun and magazine were photographed in the locations they were found, that Mr. McCord stated that he knew a magazine was on Petitioner's person "at some point," and that counsel responded, "Okay." Trial counsel agreed that Mr. McCord went on to state that the police "did an inventory" outside the house and that trial counsel asked Mr. McCord if "this all happen[ed] fairly quickly." Trial counsel did not know why he did not ask Mr. McCord how the police photographed the magazine inside the house if the magazine was found on Petitioner's person.

When asked whether the discrepancy raised a chain of custody issue, trial counsel responded negatively and noted that Mr. McCord was not the investigating officer but rather a victim. Trial counsel recalled an officer's testifying that Petitioner had a gun magazine in his pocket. When asked if he could have cross-examined the officer about the discrepancy between his statement and the photograph of the magazine inside the house, trial counsel responded, "I guess, if that's the same [magazine]. I mean, I don't really recall that being an . . . issue, necessarily." Trial counsel did not think any testimony suggested that multiple magazines were inside the house; he noted that Mr. McCord was the only person to testify about the house's contents.

- 10 -

The transcript of Officer Pickens' trial testimony was received as an exhibit and reflected that, when Officer Pickens searched Petitioner's pockets, he found a magazine[6] belonging to the firearm that was located inside the house. Officer Pickens testified that he also found wrist watches, pocket watches, knives, jewelry, "knickknacks," and a pill bottle bearing Ms. Miller's name.

Trial counsel testified that a photograph from inside Ms. Miller's house showed some of the listed items and a gun magazine laid out on a chair.[7] Trial counsel could not tell if the magazine was the same one photographed on the table, noting that he did not know if the officers "moved that one from the original picture[.]"

Trial counsel identified a copy of the arrest warrant related to the December 11, 2017 burglary of Ms. Miller's house. He agreed that Officer Pickens described the items taken from Petitioner's pockets as "a yellow case knife, a gold railroad pocket watch, a black leather wallet, a license that did not belong to [Petitioner], and approximately $50 in cash," which did not include the gun magazine. Trial counsel stated that there was no reason he did not question Officer Pickens about the omission of the gun magazine from the warrant.

Trial counsel did not remember any specific discussion with Petitioner of the *Miranda* rights waiver Petitioner signed at the police department. A copy of the waiver was entered as an exhibit; trial counsel acknowledged that Petitioner's initials did not appear beside each of "the five statements that make up the *Miranda* Waiver." Trial counsel did not recall a reason why he did not ask Investigator Leatherwood why Petitioner's initials were not on the form. Trial counsel stated that it was "sometimes" a common practice for police officers to have a person initial each of the statements on the form. When asked whether such questioning could have cast doubt on the knowing and voluntary nature of Petitioner's confession, trial counsel responded negatively and noted, "[W]e watched them go through the rights on the video and [Petitioner] sign it . . . . The fact that he didn't stick his pen to paper didn't really matter all that much when you watched him sign it."

---

[6] Officer Pickens stated, "He had a . . . magazine to a firearm that was located inside the house. The firearm was located inside the house. The magazine was in his--one of the magazines was in his pocket." Mr. McCord also referenced magazines, plural, during his trial testimony. However, it was not apparent whether more than one magazine was found during Petitioner's arrest and corresponding examination of Ms. Miller's house.

[7] The photograph showed four wristwatches, three rings, a pocket watch, a gun magazine, two identification cards, a wallet, a pack of cigarettes, a prescription pill bottle, and an empty zip-top plastic bag.

Trial counsel agreed that, had he filed a motion to suppress the confession, he would have sought to show that Petitioner was incapable of giving "specific facts and making a narrative[.]" Trial counsel did not recall seeing Petitioner's signature or initials on the photographs of stolen property shown to Petitioner during the interrogation. When asked whether the lack of a signature on the photographs tended to show that Petitioner's confession was "less knowing and voluntary," trial counsel disagreed. Trial counsel noted that he had "never, ever seen photographs signed from an interrogation" and that he would not have thought to question Investigator Leatherwood about the fact that Petitioner did not "acknowledge in writing" that he had taken the photographed items. Trial counsel stated that this line of questioning would not have made a motion to suppress more likely to succeed, and he reiterated that they had "watched the video of the confession and him showing the pictures."

Trial counsel agreed that the photograph of the chair at Ms. Miller's house showed a cigarette pack; when asked whether it was the same pack that Petitioner "represented to [trial counsel] he had hand rolled crack cigarettes in," trial counsel responded, "Yes. I guess." Trial counsel stated that he did not file a "motion to inspect" the cigarette pack because he "didn't need to prove [Petitioner] was high. No one denied that he was high." Trial counsel disagreed with the notion that discovering an "identical loaded cigarette" in the pack would have been helpful to Petitioner; he noted that he tried not to "hand over evidence to the State" and that "[i]t actually probably would have ended with an additional drug charge." He agreed, though, that it would have been inappropriate for officers to have "enabled [Petitioner] to get high right before the interview[.]" Trial counsel noted again that he was unsure how he would have questioned officers about their inadvertently allowing Petitioner to use drugs.

Trial counsel testified that he initially had "no idea" for the defense strategy because Petitioner had confessed and "was on video." Trial counsel noted that there were two sets of indictments, one for home invasions and another for burglaries of businesses, and that he also tried the latter indictment. Trial counsel stated, relative to the home invasion trial, that his strategy was "let's see what happens, honestly." Trial counsel said that the only thing he could argue was that Petitioner had confessed because he was high and hungry. Trial counsel noted that he "had to base it on the video, which was terrible, and the police officers' testimonies and then all of the victims that lined up and came in here and testified." Trial counsel stated that Petitioner had been caught inside a house and that the defense was to "make the State prove the case and hope that the jury [was] still listening . . . by . . . closing argument." Trial counsel observed that he "won on half of the charges on this case" and that he "won on all of" the business burglary charges, even though Petitioner was also "on video on that one." Trial counsel opined that he "did a pretty good job for [Petitioner.]"

On cross-examination, trial counsel testified that Petitioner was found not guilty of several aggravated burglary and felony theft charges. Trial counsel stated that he had primarily practiced criminal defense since his licensure in 2006, with the exception of three years working as a prosecutor. He estimated that all but ten or twelve of the cases he had tried involved Class A and B felonies or first degree murder.

Trial counsel testified that he generally spent most of his time on a case reviewing discovery materials; he noted that he won Petitioner's second trial by arguing that the burglar could not have been a man because a photograph showed lipstick on cigarettes. When asked why he would not "attack[] law enforcement," trial counsel responded that, from his experience, jurors tended to trust police officers. Trial counsel stated that his general strategy was to make the jury like him so that they listened to him at the end of trial.

Trial counsel testified that he "[a]bsolutely" would have filed a motion to suppress Petitioner's confession if a basis existed to suppress it. Trial counsel agreed that he had reviewed Petitioner's statement and the police cruiser recordings and that Petitioner was able to communicate with the officers. Trial counsel agreed that he successfully argued for concurrent sentencing, other than the counts that were statutorily mandated to run consecutively. Trial counsel did not represent Petitioner in General Sessions Court or at his arraignment.

Petitioner testified that, at the time he committed the burglaries in 2017, he was using crack cocaine, methamphetamine, marijuana, hydrocodone, Percocet, and any other drugs he could obtain on the street. He stated that he stayed in motels when he had money and that he slept in the woods or under bridges the rest of the time; he noted that he was usually "walking for days awake." Petitioner stated that, on the day of his arrest, he stayed with a friend in a motel and crushed up leftover cocaine and methamphetamine to make six "loaded" cigarettes using a cigarette rolling machine. He noted that a person could use loaded cigarettes to smoke drugs in public discreetly. Petitioner said that he smoked a "blunt" loaded with marijuana, crack cocaine, and methamphetamine as he walked up Cherry Street in Knoxville. He stated that he placed half of the blunt back inside his cigarette pack and that all of the cigarettes in the pack were loaded. He agreed that he was "pretty high" when he burglarized Ms. Miller's house.

Petitioner testified that he was "kind of relieved" to be arrested and not living on the streets anymore. Petitioner stated that he asked an officer for a cigarette and that the officer pulled a loaded cigarette out of Petitioner's pack, placed it in his mouth, and lit it. Petitioner agreed that the officer saw some marijuana residue inside the pack. Petitioner stated that he did not remember "too much" after smoking the loaded cigarette. He stated that he wanted to get high one last time before going to jail and that he did not realize the quantity

of drugs he had put in the cigarettes. Petitioner noted that the six cigarettes contained a total of approximately 1.5 grams of "cut crack cocaine" and 1.5 grams of methamphetamine and that he smoked the cigarette "all the way to the filter[.]"

Petitioner testified that he had no memory of riding to the police station and only remembered "[b]its and pieces" of his interview. Petitioner said, "I don't think I even knew I was in a police department." Petitioner stated that, when he watched the recording, he "couldn't believe [he] was saying the things [he] was saying." Petitioner said that, when he arrived at the jail, he had blood drawn and gave a urine sample. Petitioner stated that he asked to speak to mental health because he had been "having episodes" for two weeks that consisted of auditory and visual hallucinations, which he attributed to his drug use and lack of sleep. Petitioner estimated that he had been awake for five days prior to his arrest. Petitioner thought that he told trial counsel about his blood draw; he noted that he spent more time reviewing the discovery materials with his previous counsel, who represented him in General Sessions Court.

Petitioner testified that he informed both previous counsel and trial counsel about the loaded cigarette. Petitioner stated that trial counsel asked him during a jail visit how high he was during the interrogation and that he told trial counsel that he remembered "hardly anything." Petitioner also told trial counsel that he did not remember being interrogated at all until previous counsel showed him the interview recording. He said that, during trial, he pointed out to trial counsel the officer who gave him the loaded cigarette.

Petitioner testified that the first time he saw the police cruiser recording was at trial. He stated that he told both previous counsel and trial counsel that he did not remember being in the police cruiser or being transported to the police department, although he remembered eating pizza, crackers, and chips, and drinking soda while talking with Investigator Leatherwood. Petitioner stated that he and Investigator Leatherwood were "having a regular conversation."

Petitioner testified that he asked trial counsel if he would file a motion to suppress the confession. Trial counsel told Petitioner that the evidence was "overwhelming" and said, "[L]et's just let the State prove its case and see where it goes from there[.]"

Petitioner averred relative to the gun and gun magazine at Ms. Miller's house that he did not think he ever touched a gun and that he knew "for a fact" that he did not have a gun magazine on his person. Petitioner noted that he did not "care for weapons" and that everyone who knew him knew that he did not touch them. He stated that he asked trial counsel if he would file a motion to suppress evidence of the gun and gun magazine. Petitioner opined that trial counsel could have "done better . . . as far as trying to get the

- 14 -

confession suppressed . . . and pushing the issues on the gun charges." Petitioner stated that trial counsel generally "did an awesome job. He's an awesome person."

On cross-examination, Petitioner testified that he began abusing drugs and alcohol in 2002 after his divorce. He stated that he used powder and crack cocaine, Lortab, marijuana, and a "little bit of about everything." Petitioner said that two or three times per week, he would drink alcohol and go out to look for cocaine, marijuana, and pills. He used about one gram of cocaine per day if he could afford it. Petitioner stated that the cocaine would last "during the hours [he] was trying to get away" from his problems. Petitioner stated that he was arrested in 2005 and went to prison.

Petitioner testified that, in 2017, he moved to a Knoxville halfway house and stayed sober for six months. He stated that he began experiencing family troubles because his children were "hard on [him]" for having gone to prison and refused to let him see his grandchildren. Petitioner felt that his life was "falling apart" and began using cocaine again in October 2017, when a coworker "introduced" him to crack cocaine. He said that the drugs "took [him] over and [he] couldn't stop." Petitioner stated that he discovered methamphetamine for the first time in Knoxville, that methamphetamine was cheaper than crack cocaine, and that methamphetamine produced a strong high and lasted ten times as long as cocaine. Petitioner stated that he mixed his cocaine with methamphetamine to make it last longer. Petitioner agreed that, as time passed, he needed more drugs to achieve the same high. He estimated that he was using one to one and a half grams of cocaine daily in October 2017, and he noted that he "balanced it" with methamphetamine to "make up the extra." Petitioner said that he stayed away from other people when he was high.

When asked how a person could tell he was high, Petitioner testified that he would be jittery, talk quickly, and sweat heavily. He denied that he always experienced slurred speech and that he would stagger or fall down. He stated that he could walk and that he walked everywhere he went. Petitioner agreed that he could function and communicate, including asking the police officers to take off his hat because he was too hot. When asked whether he could tell the officers about his criminal activity, Petitioner responded, "I don't know . . . . [I]t could be some kind of just truth serum kind of thing. I don't know." Petitioner elaborated that the drugs would "make you say things you don't want to say."

Petitioner testified that he remembered some of the details of the burglaries that he gave the police during the confession. He stated, "There's some things in there I do remember, but there's a lot of things I don't remember and I . . . don't think I was a part of." Petitioner averred that he agreed with an officer a lot because the officer promised to get him more food, came back with the food and kept talking to him, and told him, "[J]ust keep talking to me, we'll . . . sit here as long as it takes." Petitioner agreed that he sold some of the stolen items at a pawn shop and that the interview recording contained his

admission that he stole guns and sold or traded them for drugs. When asked whether he recalled making the admission, Petitioner stated,

> I don't think I stole the gun, but I do remember seeing . . . a guy that I was running around with, named Rick -- and I even told [previous counsel] this, [previous counsel] knew. I give him his number and everything and told him. I said, look, [previous counsel], I never touched no guns. I took a guy to get rid of some guns, but I don't -- I don't think I ever touched them. My fingerprints wouldn't have been on them. But I do remember seeing guns.

Petitioner noted that he "might have just been talking" and that he made many statements in the confession that he did not "even know anything about[.]" Petitioner stated that he also told the officer that he had thrown jewelry in the street and into the woods but that he would "never do that."

Petitioner testified that trial counsel was a "really good attorney" and agreed that trial counsel was "very successful" in obtaining acquittals on several charges. Petitioner stated that he was serving a thirty-five-year sentence as a career offender.

On redirect examination, Petitioner testified that, relative to "certain crimes," trial counsel did not present any evidence. Petitioner averred that he had been convicted of offenses about which he knew nothing. Petitioner stated that he asked trial counsel to do unspecified things and that trial counsel did not do them.

Petitioner testified that the majority of his sentence arose from the gun offenses. Petitioner stated that he was only the "middleman" and took Rick to a third party to "get rid of them." Petitioner said that he assumed the guns were stolen because Rick gave him a quantity of jewelry that day, and Petitioner sold the jewelry.

Following the hearing, the post-conviction court entered an order denying relief. The post-conviction court found that trial counsel declined to file a motion to suppress Petitioner's confession because he did not believe a motion would have been successful and instead argued to the jury that Petitioner's statement was unreliable because he was high and confessing "to anything." The post-conviction court noted that trial counsel was "somewhat successful" because the jury acquitted Petitioner of charges related to four burglaries.

The post-conviction court credited Petitioner's testimony that trial counsel "did an awesome job" but could have "done a few things better." The post-conviction court also credited trial counsel's testimony that he did a good job in a case "involving overwhelming

- 16 -

proof," that he investigated the case and developed a strategy, and that he was successful in obtaining some acquittals.

Relative to trial counsel's investigation, the post-conviction court found that trial counsel did not examine the cigarette package, try to obtain Petitioner's toxicology report, or have the cigarettes tested because it was uncontested that Petitioner had been using drugs and because trial counsel did not believe Petitioner's drug use was a basis for suppression. The post-conviction court found that, despite Petitioner's testimony that he could not remember much of his police interview, the interview recording demonstrated that Petitioner was coherent and able to make a knowing and voluntary waiver of his rights. The post-conviction court noted that Petitioner told the officers that he remembered everything he took and had looked up the value of the items using Google. The post-conviction court found that trial counsel "made a strategic decision to try to use the confession in [Petitioner's] defense and not seek a suppression which he believed would not be successful."

The post-conviction court concluded that trial counsel was not deficient and that Petitioner had not established that a motion to suppress would likely have been successful. The post-conviction court found that the police cruiser and interview recordings showed that Petitioner was "fully cognizant of his circumstances, was able to communicate clearly with the officers, and understand what he was being asked." The post-conviction court concluded that Petitioner was not prejudiced because, independently of his confession, "he was caught red-handed in one of the victim's homes and had been in possession of her firearm" and had "personally pawned many of the items taken from the other homes."

The post-conviction court concluded that trial counsel was not deficient for failing to examine or test the cigarettes or investigate whether Petitioner's blood and urine samples were available for testing. The post-conviction court found relative to trial counsel's interviewing Petitioner about his state of mind during the confession that Petitioner and trial counsel met multiple times and that trial counsel was aware that Petitioner had used drugs and had claimed he was high when he committed the burglaries, including the burglary of Ms. Miller's house preceding his arrest and subsequent confession. The post-conviction court concluded that Petitioner had not met his burden of establishing that further investigation would have "produced any evidence that may have made a difference in the face of the overwhelming proof in this case."

Relative to trial counsel's cross-examination of Mr. McCord and the law enforcement witnesses, the post-conviction court found that Petitioner failed to demonstrate that trial counsel was not adequately prepared. The post-conviction court found that no doubt existed that Petitioner had possessed Ms. Miller's gun and magazine and that "[a]ny additional questions on these matters would be very unlikely to cast doubt

that . . . Petitioner had not done what he admitted to doing and was caught in the act of doing." The post-conviction court denied relief, and Petitioner timely appealed.

## *Analysis*

On appeal, Petitioner contends that the post-conviction court erred in denying his claim that trial counsel provided ineffective assistance of counsel because trial counsel failed to (1) investigate or seek testing of Petitioner's blood, urine, and cigarettes; (2) file a motion to suppress Petitioner's confession based upon Petitioner's intoxication; and (3) adequately cross-examine the law enforcement witnesses about Petitioner's intoxication. The State responds that the post-conviction court properly determined that trial counsel's performance was not deficient.

To prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, this court "need not address both elements if the petitioner fails to demonstrate either one of them." *Kendrick*, 454 S.W.3d at 457. Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting

effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

*a. Investigation/testing of cigarettes, blood, and urine*

Petitioner contends that, given trial counsel's stated defense theory that Petitioner only confessed because he was "high and hungry," trial counsel's "failing to thoroughly investigate the full circumstances of [Petitioner's] intoxication" constituted deficient performance and prejudiced him. The State responds that the post-conviction court found that trial counsel investigated the case, developed a reasonable defense strategy, and was not deficient. The State also argues that Petitioner cannot demonstrate prejudice because he presented no proof about the availability of the samples for testing and has not shown that further proof he was high would have helped his case.

We note that trial counsel's failure to procure funds to test the cigarettes and Petitioner's urine sample[8] was not raised in the post-conviction petition, as amended. However, the cigarettes and urine sample were raised at the post-conviction hearing and addressed by the post-conviction court. Accordingly, the record is sufficient for us to review Petitioner's issue on appeal. *Holland v. State*, 610 S.W.3d 450, 459 (Tenn. 2020).

---

[8] The blood sample was included in the post-conviction petition.

Trial counsel has a duty to "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter*, 523 S.W.2d at 933. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691; *see also State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). However, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691.

The post-conviction court found that trial counsel was not deficient for failing to examine or test the cigarettes or investigate whether Petitioner's fluid samples were available for testing. Relative to trial counsel's general investigation, the post-conviction court found that Petitioner and trial counsel met multiple times and that trial counsel was aware that Petitioner had used drugs and had claimed he was high when he committed the burglaries, including the burglary of Ms. Miller's house preceding his arrest and subsequent confession. The post-conviction court concluded that Petitioner had not met his burden of establishing that further investigation would have "produced any evidence that may have made a difference in the face of the overwhelming proof in this case."

As the State notes in its brief, no evidence in the record indicates whether the cigarettes and fluid samples still existed at the time trial counsel began representing Petitioner after his arraignment. Further, as we discuss in more detail below relative to the motion to suppress, we disagree with Petitioner that testing the allegedly loaded cigarettes, blood sample, or urine sample would have provided trial counsel with "solid grounds" to challenge the voluntariness of Petitioner's police statement. Petitioner did not present at the post-conviction hearing evidence of what testing of the cigarettes or fluid samples would have revealed, and no toxicology report appears in the trial or post-conviction records. This court cannot speculate about the effect of a hypothetical toxicology report on a motion to suppress or the trial. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. Apr. 11, 1990). Accordingly, we agree with the post-conviction court that Petitioner has not proven that he was prejudiced by the lack of a toxicology report.

Similarly, although Petitioner mentions in his brief that trial counsel could have used a toxicology report to obtain funding for an expert witness, Petitioner did not address at the post-conviction hearing whether an expert witness would have been required to interpret the results of a toxicology report for the jury, and he did not call an expert witness to testify. To prove prejudice when trial counsel fails to call a witness at trial, a petitioner must present that witness at the post-conviction hearing. *See id.* at 757-58. "It is elementary that neither a trial judge nor an appellate court can speculate . . . what a witness's testimony

- 20 -

might have been[.]" *Id*. at 757. Regardless, to the extent that Petitioner has obliquely raised trial counsel's failure to call an expert witness for the first time on appeal, this court is without authority to consider issues that were not addressed by the post-conviction court. *Holland*, 610 S.W.3d at 459.

We further note that trial counsel articulated strategic reasons not to seek testing; he stated that he would have expected the State to provide any significant testing results in discovery, that he did not want to provide the State with additional evidence, and that Petitioner could have been charged with drug offenses if testing showed illicit drugs in the cigarettes. The record supports the post-conviction court's determination that trial counsel met with Petitioner multiple times before trial, reviewed the discovery materials, developed a partially successful defense strategy, and his investigation and preparation for trial were not deficient. Petitioner is not entitled to relief on this basis.

### B. Motion to suppress

Petitioner contends that trial counsel provided ineffective assistance by failing to file a motion to suppress Petitioner's confession due to his intoxication from having smoked the loaded cigarette upon his arrest. The State responds that the post-conviction court correctly found that a motion to suppress was unlikely to succeed, that trial counsel strategically decided to use the confession as part of the defense strategy, and that trial counsel was not deficient in this regard.

As a preliminary matter, Petitioner argues that the post-conviction court erroneously applied the standard in *Phillips v. State*, in which our supreme court articulated the following:

> [T]o establish a successful claim of ineffective assistance of counsel based on counsel's failure to file a motion to suppress evidence on Fourth Amendment grounds, the Petitioner must prove: "(1) a suppression motion would have been meritorious; (2) counsel's failure to file such motion was objectively unreasonable; and (3) but for counsel's objectively unreasonable omission, there is a reasonable probability that the verdict would have been different absent the excludable evidence."

647 S.W.3d 389, 404 (Tenn. 2022) (citations omitted). The *Phillips* court cautioned that "[i]t remains the petitioner's burden to prove the factual allegations supporting all claims in the petition by clear and convincing evidence." *Id.* (citing Tenn. Code Ann. § 40-30-110(f)). In *Phillips*, the petitioner asserted that trial counsel was ineffective for failing to file a motion to suppress his statement to police based upon his Fourth Amendment right to a prompt probable cause determination. *Id.* at 399.

Petitioner avers that *Phillips* is inapplicable to Petitioner's case because his suppression claim is based upon a violation of Fifth Amendment due process principles. Instead, Petitioner urges this court to apply the standard articulated in *Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at *8 (Tenn. Crim. App. Sept. 12, 2011), *no perm. app. filed*. In *Cecil*, a panel of this court considered an ineffective assistance of counsel claim in the context of trial counsel's failure to file a motion to suppress the petitioner's statements to police based upon an alleged violation of the petitioner's Fifth Amendment rights. *Id.* This court stated,

> In order to show prejudice, [p]etitioner must show by clear and convincing evidence that (1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested. In essence, the petitioner should incorporate a motion to suppress within the proof presented at the post-conviction hearing.

*Id.*

As noted by the State, in *Phillips*, our supreme court considered whether *Cecil* "imposes an improper burden on petitioners to prove prejudice by clear and convincing evidence rather than prove the *factual allegations* in support of such claim by clear and convincing evidence, as is required by the [Post-Conviction Procedure Act]." *Phillips*, 647 S.W.3d at 403 (emphasis in original). The motion to suppress at issue in *Phillips* would have been based upon a Fourth Amendment violation resulting from the petitioner's having been held at the police department for an extended period of time before his formal arrest. Our supreme court held that the case was governed by *Kimmelman v. Morrison*, 477 U.S. 365 (1986), in which the United States Supreme Court considered an ineffective assistance claim predicated upon trial counsel's failure to file a Fourth Amendment motion to suppress. *Id.* After comparing *Kimmelman* and *Cecil*, our supreme court noted that the two standards were "nearly identical," although the court "acknowledge[d] that the *Cecil* panel could have been more precise when reciting the petitioner's burden of proof." *Id.* Our supreme court specifically noted that *Cecil* was not "bad law" but rather an accurate statement of the law that was imprecise in its wording. *Id.*

Appellate post-conviction counsel acknowledges the existence of "one opinion applying the standard in *Phillips* to a claim of ineffective assistance of counsel for failure to file a motion to suppress a [p]etitioner's statement." *See Hall v. State*, W2022-00642-CCA-R3-PC, 2023 WL 3815065, at *3 (Tenn. Crim. App. June 5, 2023), *no perm. app.*

- 22 -

*filed*.  However, this court has applied *Phillips* in several such cases[9] since its June 2022 publication.  *See, e.g.*, *Massengill v. State*, No. E2022-00092-CCA-R3-PC, 2022 WL 6679915, at *7 (Tenn. Crim. App. Oct. 11, 2022) (applying *Phillips* to an ineffective assistance claim regarding trial counsel's failure to file a motion to suppress the petitioner's statement to detectives on Fifth Amendment grounds), *no perm. app. filed*; *Simpson v. State*, No. W2021-00849-CCA-R3-PC, 2022 WL 2966281, at *10 (Tenn. Crim. App. July 27, 2022) (similar), *perm. app. denied* (Tenn. Dec. 19, 2022); *Gutierrez v. State*, No. M2021-00298-CCA-R3-PC, 2022 WL 2294897, at *7-8 (Tenn. Crim. App. June 27, 2022) (similar), *no perm. app. filed*.

Likewise, we note that *Cecil*'s general statement that a petitioner should "incorporate a motion to suppress within the proof presented at the post-conviction hearing" has been cited alongside *Phillips* in post-*Phillips* opinions analyzing post-conviction ineffective assistance claims involving Fourth Amendment motions to suppress. *See, e.g., Johnson v. State*, No. M2023-00049-CCA-R3-PC, 2024 WL 2844196, at *5 (Tenn. Crim. App. June 5, 2024) (quoting *Cecil* while applying the three-part *Phillips* test when the motion to suppress at issue would have been based upon a Fourth Amendment violation related to a GPS tracker on a car); *Champion v. State*, No. W2021-01392-CCA-R3-PC, 2022 WL 4242901, at *6 (Tenn. Crim. App. Sept. 15, 2022) (similar, when the Fourth Amendment violation related to a search), *perm. app. denied* (Tenn. Dec. 14, 2022). In agreement with our supreme court's discussion of the close similarity between *Cecil* and *Kimmelman* and this court's consistent application of *Phillips* and *Cecil* in cases involving Fourth and Fifth Amendment motions to suppress, we clarify that *Phillips* applies to any ineffective assistance claim based on the failure to file a motion to suppress—regardless of the constitutional basis for suppression.

Both the United States and Tennessee Constitutions protect against compelled self-incrimination.  U.S. Const. amend. V; Tenn. Const. art. I, § 9.  In order to protect criminal defendants from self-incrimination, the United States Supreme Court has ruled that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v.*

---

[9] We also note that this court has continued to apply *Phillips* in other cases not involving Fourth Amendment motions to suppress decided after Petitioner's brief was filed on July 31, 2023.  *See Ramey v. State*, No. E2023-00724-CCA-R3-PC, 2024 WL 2078568, at *6 (Tenn. Crim. App. May 9, 2024) (applying *Phillips* when the motion to suppress at issue would have been based upon a Fifth Amendment violation related to the victim's identification of the petitioner); *Jones v. State*, No. M2022-01315-CCA-R3-PC, 2023 WL 5815740, at *24 (Tenn. Crim. App. Sept. 8, 2023) (applying *Phillips* when the motion to suppress at issue would have been based upon a Fifth Amendment violation related to the victim's identification of the petitioner), *no perm. app. filed*.

*Arizona*, 384 U.S. 436, 444 (1966); *State v. Walton*, 41 S.W.3d 75, 82 (Tenn. 2001). As part of those safeguards, police are required to inform persons who are subjected to custodial interrogation: (1) that they have the right to remain silent; (2) that any statement made may be used as evidence against them; (3) that they have the right to the presence of an attorney during questioning; and (4) that if they cannot afford an attorney, one will be appointed for them prior to questioning, if so desired. *See Miranda*, 384 U.S. at 444.

A defendant may waive his rights under *Miranda* if such waiver is voluntary, knowing, and intelligent. *State v. Echols*, 382 S.W.3d 266, 280 (Tenn. 2012). To determine whether a defendant waived his rights voluntarily, knowingly, and intelligently, courts must look at the totality of the circumstances. *Id.* Relevant factors include:

> the age and background of the defendant; his education and intelligence level; his reading and writing skills; his demeanor and responsiveness to questions; his prior experience with the police; any mental disease or disorder; any intoxication at the time of the waiver; and the manner, detail, and language in which the *Miranda* rights were explained.

*Id.* at 280-81.

In evaluating whether a statement was given voluntarily, "the essential inquiry . . . is whether a suspect's will was overborne so as to render the confession a product of coercion." *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (citing *Dickerson v. United States*, 530 U.S. 428, 433-35 (2000); *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996)). A suspect's subjective perception alone is insufficient to support a conclusion of involuntariness of a confession. *Smith*, 933 S.W.2d at 455 (citing *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)). Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary[.]" *Brimmer*, 876 S.W.2d at 79. The voluntariness of a confession is a question of fact. *State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014) (citing *Walton*, 41 S.W.3d at 81; *State v. Morris*, 24 S.W.3d 788, 805 (Tenn. 2000); *Smith*, 933 S.W.2d at 455; *Self v. State*, 65 Tenn. 244, 253 (Tenn. 1873)). A court determining voluntariness must examine the totality of the circumstances surrounding the giving of a confession, "both the characteristics of the accused and the details of the interrogation." *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434).

It is well established that "[t]he ingestion of drugs and alcohol does not in and of itself render any subsequent confession involuntary," unless the suspect's faculties were "so impaired that the confession cannot be considered the product of a free mind and rational intellect." *Morris*, 24 S.W.3d at 805 (quoting *State v. Robinson*, 622 S.W.2d 62, 67 (Tenn. Crim. App. 1980)). "The test to be applied in these cases is whether, at the time of the statement, the accused was capable of making a narrative of past events or of stating

his own participation in the crime." *Id.* This court has previously discussed that a "statement provided by a suspect who is under the influence of drugs is admissible so long as the statement is coherent." *State v. Perry*, 13 S.W.3d 724, 738 (Tenn. Crim. App. 1999) (citations omitted); *see generally State v. Morris*, No. W2011-02339-CCA-R3-CD, 2013 WL 12181755, at *8 (Tenn. Crim. App. Sept. 13, 2013), *no perm. app. filed*.

We agree with the post-conviction court that Petitioner did not meet his burden of establishing that a motion to suppress would have been successful. The record reflects that Petitioner, who was middle-aged and had earned his GED, paid attention while he was read his rights, stated that he understood the consequences of speaking to the police without an attorney, and signed the waiver form in two places. Investigator Leatherwood used easily understandable language when explaining Petitioner's rights, and he did not rush through the form. As a career offender, Petitioner presumably had prior experience with the police. Petitioner proceeded to discuss several discrete burglaries, including descriptions of where the houses were located, information on how he entered some of the houses, and lists of items he took. Petitioner stated that he remembered the items he sold because he looked up their values on Google. Petitioner was polite, indicated his desire to be helpful, and gave responsive, appropriate answers to questions. Likewise, Investigator Leatherwood spoke calmly with Petitioner, was polite, and did not behave aggressively in any way. Petitioner's speech and physical demeanor were normal, and he was not noticeably intoxicated, as Investigator Leatherwood observed during the interview. We note Petitioner's testimony at the post-conviction hearing that, due to his frequent drug use, he had to use increasing quantities of cocaine to achieve the same high. Petitioner noted in the post-conviction petition and at the post-conviction hearing that he sought a mental health evaluation when he was booked in at the jail, but he did not present any further evidence that he was suffering from mental illness at the time of his confession, and his demeanor at the interview did not reflect any obvious mental issues. The totality of the circumstances reflect that Petitioner's statement was voluntarily, knowingly, and intelligently made.

Because a motion to suppress would not have succeeded, the post-conviction court correctly concluded that trial counsel was not deficient for failing to file one and that Petitioner was not prejudiced. *See Phillips*, 647 S.W.3d at 404. Petitioner is not entitled to relief on this basis.

### C. Cross-examination of law enforcement witnesses

Petitioner contends that trial counsel was ineffective when he "failed to cross examine key witnesses on the undisputed fact about [Petitioner's] intoxication after testifying that such cross-examination was the only viable defense strategy." The State responds that trial counsel's cross-examination was strategic and that Petitioner did not

demonstrate what impact additional questioning about his intoxication would have had on the trial.

The trial transcript reflects that Investigator Leatherwood testified on direct examination that Petitioner reported having used cocaine six hours before the interview and that the State asked Investigator Leatherwood if Petitioner appeared to be high. Investigator Leatherwood responded that Petitioner was coherent and spoke normally and that he had no trouble understanding Petitioner. Trial counsel's cross-examination centered on the food provided to Petitioner, Petitioner's evident hunger, and his cooperation with the police. In light of the fact that Investigator Leatherwood had already opined that Petitioner did not seem to be intoxicated, trial counsel's focus on cross-examination was reasonable and consistent with the defense theory. In addition, trial counsel stated at the post-conviction hearing that juries tended to trust law enforcement officers and that he avoided "attacking" them on the stand in order to preserve his rapport with the jury as a matter of strategy. We note that the jury could assess Petitioner's level of intoxication by watching the interview recording and that Petitioner discussed his drug addiction and use in some detail in his confession. We agree with the post-conviction court's finding that trial counsel was not deficient in this regard.

Petitioner has also not proven prejudice because he did not call Investigator Leatherwood or any other officers as witnesses at the post-conviction hearing. We cannot speculate as to what Investigator Leatherwood or the additional officers' testimony would have been had trial counsel asked them additional questions about Petitioner's alleged intoxication. *Black*, 794 S.W.2d at 757 ("It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of . . . what a witness's testimony might have been if introduced by defense counsel"). Petitioner is not entitled to relief on this basis.

### *Conclusion*

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 26 -